UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RITA RUVO,

                        Plaintiff,

      -against-                                  3:15-cv-0768 (LEK)

CAROLYN W. COLVIN,
Commissioner of Social Security,

                        Defendant.

_____

## DECISION and ORDER

## I.    INTRODUCTION

This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed in appealing a denial of Social Security benefits. Both parties have filed briefs. Dkt. Nos. 17 ("Plaintiff's Brief"); 20 ("Defendant's Brief"). For the following reasons, the judgment of the Social Security Administration ("SSA") is vacated and remanded.

## II.    BACKGROUND

On May 23, 2012, Plaintiff Rita Ruvo ("Plaintiff") protectively filed an application for Title II disability insurance benefits, alleging disability due to back pain, depression, and nerve damage in her legs, with an onset date of February 15, 2012. See Dkt. No. 15 ("Record") at 23, 168, 172.[1] The application was denied on August 9, 2012. R. at 108. Plaintiff then filed a request for a hearing with an administrative law judge ("ALJ"). R. at 116. On September 10, 2013 Plaintiff appeared .

_____

[1] Citations to the Record use the pagination assigned by the SSA.

1

with counsel for an in-person hearing in Binghamton, New York, in front of ALJ F. Patrick Flanagan. R. at 38-80.

## A. Plaintiff's Medical Records

Plaintiff was born on June 11, 1962. R. at 10, 32. Plaintiff's oldest relevant medical records indicate she was seen on April 14, 2008 at Chenango Memorial Hospital ("CMH") for headaches, muscle aches, chest pain, and acute back pain. R. at 26, 229. The physician's clinical report indicated that Plaintiff reported suffering from similar back pain and headache symptoms several times per year. R at 228. There is no record of her receiving treatment for these symptoms prior to April 14, 2008. Plaintiff was first seen by the treating physician at 9:26 AM. R. at 228. At 10:51 AM, Plaintiff was observed pacing around her room, and at this time she informed the physician that she felt a lot better and that her headache and back pain was gone. R. at 229. At this visit, Plaintiff stated she has been told she suffers from depression, likely due to seasonal affective disorder. R. at 228. Plaintiff was discharged and prescribed a modest course of hydrocodone. R. At 229. She was also instructed to take over-the-counter Motrin IB as needed for pain. Id.

On November 16, 2011, Plaintiff was seen as a walk-in patient at CMH, with a chief complaint of back pain. R. at 214. Plaintiff reported sharp pain at a level of 8 out of 10. R. at 216. The physician's clinical report, prepared by Colleen Magai, RPA, stated that Plaintiff worked as a home health aide at this time, and that she had fallen on her buttocks and lower back while assisting her client with bathing. Id. Plaintiff stated that the client she works for slips "a lot", Plaintiff tries to catch her when this occurs. R. at 214. Plaintiff had history of chronic back pain, and acute leg pain with no numbness or tingling present. Id. Plaintiff stated that she presented with similar lower back symptoms to her primary care physician six to eight weeks prior to this visit. Id. The clinical

2

impression was acute lumbar strain, and Plaintiff was discharged, prescribed hydrocodone, ibuprofen, and cyclobenzaprine, and instructed to follow up with her primary care physician.  R. at 215.

Two weeks later, Plaintiff was seen by Jessica Parker, LPN, and David Sandway, NP, for a workers' compensation appointment due to persistent lower back pain from her prior injury.  R. at 288.  Plaintiff reported a pain level of 6 out of 10 during this visit, adding that medication and rest helped curb her pain.  R. at 289.  Further, Plaintiff appeared alert and oriented to her environment, with grossly normal intellect, and normal reflexes.  R. at 290.  An MRI of the Plaintiff's lumbar spine was ordered following a negative x-ray.  R. at 290.  The next day, Plaintiff had an MRI of her spine performed, which was interpreted by Mitchell Chess, M.D.  R. at 292.  Dr. Chess noted mild loss of disk height and signal at L4-L5, no evidence of disk bulging or herniation, and no evidence of spinal stenosis.  Id.

On January 25, 2012, Plaintiff was seen for a neurosurgical evaluation by Khalid Sethi, M.D.  R. at 218.  Dr. Sethi reviewed the MRI performed on December 1, 2011, and noted spondylitic changes on L4-L5 and L5-S1, which were not severe enough to warrant surgical intervention.  R. at 219.  Dr. Sethi recommended that Plaintiff treat her pain with physical therapy using traction and palliative strategies.  Id.

Plaintiff was seen two weeks later at Comprehensive Pain Relief pain management clinic by Dr. Sajid Khan.  R. at 225.  Dr. Khan recommended a lumbar epidural steroid injection, which was performed on February 13, 2012.  R. at 220.  Two days later, on February 15, Plaintiff was seen by Dr. Frank Cole as a walk-in patient at CMH following an injury very similar to her injury on November 16, 2011.  R. at 231-32.  Plaintiff reported that she was working with the same client she

was with when she injured herself in November 2011, and reported lower back pain, coupled with some numbness and tingling in her left leg and feet.  R. at 232.  The physician also noted muscle spasms and limited range of motion involving the left, right, and central lower back.  R. at 233. Plaintiff's sensory and reflex examination was within normal limits.  Id.  She was discharged with instructions to follow up with her primary care physician and Dr. Sethi, and was prescribed Percocet for pain, dexamethsone, and Valium.  R. at 234.

On February 27, 2012, Plaintiff was again seen at Comprehensive Pain Relief.  R. at 294. Plaintiff reported pain associated with walking, ascending or descending stairs, lifting, standing, and twisting.  R. at 296.  Plaintiff also reported pain relief from medications, heat, and rest during this visit.  Id.

From March through June 2012, Plaintiff was seen multiple times by her primary care physician and at Comprehensive Pain Relief for follow up appointments.  R. at 262-80, 299-310. Plaintiff was also seen at Basset Medical Center by Dr. Marshall Pedersen in April 2012.  R. at 237. At Basset, Plaintiff reported a burning sensation in her lower back, plus buttock and posterior thigh pain extending to the knee.  Id.  Dr. Pedersen's clinical report indicated that the MRI done in December 2011 showed degeneration of the L4-L5 disk, and stated that her symptoms were the result of the two axial loading injuries occurring on November 16, 2011, and February 15, 2012.  R. at 239.  Dr. Pedersen instructed Plaintiff to follow up with her primary care provider, to continue her physical therapy, and to contact him if her primary care provider asked her to.  R. at 240.  Reports from Plaintiff's primary care provider and Comprehensive Pain Relief from March to June 2012 indicate that her pain was persistent but stable.  R. at 262-80, 299-310.  A blood screening was

performed on March 7, 2012. R. at 311. The results indicated that Plaintiff had not been taking her prescription for Percocet. Id.

Plaintiff had an MRI of her lumbar spine performed at Cooperative Magnetic Imaging in Utica, New York, in May 2012. R. at 250. The clinician found a mild broad-based posterior disc bulge at L4-L5 with mild foraminal stenosis, consistent with the findings from the MRI performed in December, 2011. R. at 239, 251.

On June 18, 2012, Plaintiff was seen by her primary care physician for symptoms of depression. R. at 397. She reported that she was experiencing difficulty meeting daily obligations, a decreased sense of pleasure, depressed mood, fatigue, feelings of guilt or worthlessness, poor concentration, and indecisiveness. Id. The physician's clinical report indicates that Plaintiff had symptoms of a major depressive episode. Id.

Plaintiff was seen on July 5, 2012, for an independent medical evaluation by Dr. Steven Hausmann. R. at 402. Plaintiff's gait pattern was normal, but there was some tenderness to palpitation at the lumbosacral junction, and she could not flex forward more than thirty degrees without pain. R. at 404. Plaintiff had tightness in the paraspinal muscles, and a negative straight leg and reverse straight leg raise on each side. Id. Plaintiff's reflexes and sensory exam were intact, and there was no sign of motor weakness or atrophy. Id. Plaintiff's overall disability was characterized as mild to moderate. Id. Finally, Dr. Hausmann concluded that Plaintiff could return to work with no bending or stooping, and that she could stand and walk for six to eight hours per day with breaks and lift up to 35 pounds.

Rachelle Hansen, Psy.D., of Industrial Medicine Associates in Utica, New York, performed a consultative psychological evaluation of Plaintiff on July 16, 2012. R. at 314. During this visit,

Plaintiff reported loss of appetite, depression, crying spells, hopelessness, loss of usual interests, loss of energy, and social withdrawal. Id. Plaintiff stated that she is able to dress, bathe, groom herself, and do some light cleaning, but that she is not able to cook, or do any lifting. R. at 315. Plaintiff was able to follow directions, understand simple instructions, perform simple tasks independently, maintain attention and concentration, maintain a schedule, and learn new things and tasks. Id. Dr. Hansen indicated that Plaintiff's psychological symptoms were consistent with stress-related problems, and were not significant enough to interfere with her ability to function on a daily basis. R. at 316-17. Dr. Hansen recommended that Plaintiff schedule a medical follow-up and evaluation, as well as individual psychotherapy to address pain management and coping skills. R. at 317.

Plaintiff was seen in July and September 2012 at Comprehensive Pain Relief for medication renewal and symptom management. R. at 358-63. During a July 18 visit, Plaintiff reported a pain level of 6 out of 10 in her lower back, and that the pain is aggravated by sitting or standing. R. at 362. She also indicated her symptoms are relieved by heat, ice, movement, pain medication, and rest. Id. The physician found Plaintiff's pain to be stable on the then-current regimen, and that her urine was positive for opiates at that time. R. at 363. The clinical report from a September 14 visit notes nothing different than the July 18 report. R. at 358-59.

On October 17, 2012 Plaintiff was seen by state agency evaluator Judy Panek, M.D., for a residual functional capacity evaluation. R. at 27, 327-28. Dr. Panek indicated Plaintiff could perform light work, but with only occasional climbing ramps/stairs, ladders/ropes/scaffolds, and no balancing or stooping, occasional kneeling, and no crouching. R. at 99.

From October 2012 to February 2013, Plaintiff continued to attend regular appointments at

Comprehensive Pain Relief. R. at 346-58. Plaintiff was also seen in October and November 2012, by her primary care physician. R. 389-96. During an October 2 visit, Plaintiff reported a 6 out of 10 level of pain, no improvements or worsening of her symptoms, and low energy. R. at 393-94. Plaintiff was seen on November 27 by her primary care physician for her depression symptoms. R. at 389. During that visit, Plaintiff stated that she was experiencing a depressed mood, and her prescription for Wellbutrin, which she had been taking since early October 2012, was discontinued. R. at 389, 391, 396.

Plaintiff was reexamined by Dr. Hausmann in February 2013, who again noted that Plaintiff had mild to moderate disability, and could not bend or stoop, and should lift only up to 25 pounds. R. at 409. Dr. Hausmann assessed that Plaintiff could stand or walk for four to six hours per day, with breaks. Id.

On March 7, 2013, Plaintiff was seen at Comprehensive Pain Relief by Kimberly Kurrey, FNP. R. at 346. Plaintiff reported that her pain was worsening at this point, with a back pain level of 8/10, as well as anxiety and depression. R. at 346-47. FNP Kurrey's assessment included non-specific lumbosacral neuritis, lumbosacral spondylosis, and lumbar/lumbosacral disk degeneration. R. at 348. On April 19, 2013, FNP Kurrey saw Plaintiff for a scheduled appointment. R. at 342. The clinical report from this date indicated that Plaintiff's pain level had been recently fluctuating between 5 out of 10 and 8 out of 10. R. at 342-43. Plaintiff reported continuing symptoms of depression and anxiety, but did not appear to be anxious during this appointment. R. at 343. Plaintiff was seen again at Comprehensive Pain Relief by FNP Kurrey on May 24, 2013. R. at 339. Plaintiff reported a pain level of 5 out of 10 during this visit, but that her pain was still fluctuating, and stated that she was back to working three days per week. R. at 339-40. On June 24, 2013,

Plaintiff was seen again at Comprehensive Pain Relief, reporting that her pain was still fluctuating and was at a level of 7 out of 10 on that date. R. at 335. Plaintiff reported that her symptoms were still relieved by ice, heat, movement, and pain medications. Id. On July 23, 2013, Plaintiff was treated with a lumbar medial branch block at Comprehensive Pain Relief, which successfully relieved some of her pain. R. 330-34.

Orthopedic surgeon Dr. Donald Paarlberg performed an independent medical evaluation of Plaintiff on June 13, 2013. R. at 412. Dr. Paarlberg concluded Plaintiff's discogenic back pain was caused by her work-related injuries, and resulted in a marked degree of disability per New York State Workers' Compensation Board Medical Guidelines of 1996. R. at 414. He further noted that maximum medical improvement had not been reached, and that Plaintiff could perform work with a sit/stand option with no bending. Id.

Plaintiff was seen by her primary care physician for a workers' compensation appointment on July 29, 2013, during which she stated that her back pain was worsening. R. at 384. During this appointment, Plaintiff stated that her depressive symptoms had been worsening, and that she began injections for pain management roughly two weeks prior. Id. She also stated that she had returned to work for less than a week in May 2013, but was unable to continue the job due to her back pain. Id. Plaintiff was seen again by her primary care physician on August 28, 2013, reporting a pain level of 4 out of 10, and was referred to physical therapy. R. at 380, 383. The physician's clinical report from this appointment notes that the Plaintiff denied feelings of anxiety, hopelessness, or mood swings. R. at 382.

**B. ALJ Hearing**

Plaintiff testified at a hearing before ALJ Flanagan on September 10, 2013, in Syracuse, New York. R. at 40. She stated that she dropped out of high school during tenth grade because there were "problems at home" and because she became pregnant about the same time. R. at 47. At the time of the hearing Plaintiff was working on getting her GED through, and that she possessed reading, writing, and basic math skills. R. at 48. She was employed as a personal care assistant for roughly seven years, primarily serving a client whom she was acquainted with outside of work. R. at 48-49. She testified that two work-related injuries, occurring in November 2011 and February 2012, are the source of her back pain, that both of the injuries occurred while working with the same client, and that she did not have any back trouble before these injuries. R. at 49-50, 52. Her duties as a personal care aide included cleaning, shopping, and cooking, but she did not provide any type of medical assistance for the client. R. at 48. She testified that the first injury occurred when she was attempting to remove her client's leg from a wash basin with the assistance of a therapist who also served the client. R. at 49. The therapist was attempting to remove the client's leg from the wash basin while the Plaintiff was moving the wash basin away from the client's leg. Id. Plaintiff states that the therapist dropped the client's leg in the basin while she was attempting to move the basin, which stopped the basin from moving, and she then fell back on her buttocks. R. at 49-50. Plaintiff stated that she returned to work with the same client roughly two weeks after this injury, and the client's leg made her nervous. R. at 50. Plaintiff further testified that the second injury involved the same client and the same therapist, who had implemented a new strategy for moving the client's leg. Id. [2]

---

[2] Plaintiff's description of the details of how she was injured in February 2012 are missing from the transcript of the ALJ hearing, presumably due to a transcription error.

Plaintiff confirmed that she had been employed as a cashier prior to her work as a personal care assistant. R. at 50. She stated that her duties included running the cash register, running the lottery machine, stocking coolers, and that the heaviest thing she was required to lift was "a 12-pack or 18-pack." R. at 50, 74-75. Plaintiff also testified that, in May 2013, she was employed for two days at a miniature horse farm, stating that "[t]he lady tried me out because [of] workman's comp, I guess." R. at 51. Plaintiff stated that she attempted this job because she spoke with her lawyer for workers' compensation, and wanted to get back to doing something. Id. Plaintiff then stated that she was dismissed from the job because it required her to lift bales of hay, which she did not realize, or was not told, would be part of the job. Id.

Plaintiff describes her pain as a shooting or burning sensation that sometimes radiates down to one or both of her legs, and that she knows when the pain is coming. R. at 52. She stated that, during the ALJ hearing, her pain level was a 4 out of 10 or 5 out of 10, representative of a "good day" for her. R. at 57-58. Although she can sense when the pain is coming, attempts to pinpoint what activities trigger the pain have proven ineffective. R. at 53. She states that she could be doing nothing and the pain might begin, or that she may be in pain while walking and the pain will stop. Id. She adds that her symptoms occur anywhere from one to four times per week, and usually take hours of lying in bed to subside. Id.

Plaintiff testified that most of her treatment for her back pain has been by Dr. Khan and FNP Kurrey at Comprehensive Pain Relief. R. at 55. She stated that she has had at least two injections at Dr. Kahn's office for pain management. R. at 56. She added that the first injection in early 2012 "was really bad," as after the injection she could not move her right leg and was in bed for two days.

Id.  Plaintiff then refused further injections until July 2013, when she received an injection which "took a whole lot off" her discomfort for about two weeks.  Id.

Plaintiff had also been taking Cymbalta, hydrocodone, Gabapentin, cyclobenzaprine, and Valium daily for pain relief, and she sometimes felt dizzy or became constipated from the medicines.  R. at 57.  She added that heating pads have helped relieve her pain, and that physical therapy also helped to relieve her pain.  R. at 58.  She also stated that she engages in exercises recommended by her physical therapist, sometimes daily, or sometimes at a variable frequency if her pain prevents her from doing so.  R. at 63.

Plaintiff stated that, on an average day, she is only able to sit for about twenty minutes without shifting around or getting up, though her medicines allow her to sit "a little longer," and that she is able to walk for less than twenty minutes at a time  R. at 58-59.  She added that leaning on something when she is walking or standing is helpful.  R. at 60.  Plaintiff testified that she is able to do her own grocery shopping for the most part, and while she is able to lift a gallon of milk, she relies on her daughter to place dog food in the cart.  Id.  She added that her hands and fingers work "most of the time".  Id.  She also stated that she is not able to cook, or do dishes, and while she cannot scrub her bathtub or toilet, she is able to mop the floor.  R. at 61-62.  She stated that she cannot do laundry, but that she does gather the laundry together for her daughter.  R. at 62.  She bathes and clothes herself, but sometimes she struggles to put on her socks and shoes, and only gets dressed if she is going somewhere.  Id.  Plaintiff stated that her daughter drives her most places, but sometimes she will drive herself to the store if she is craving a piece of candy or donuts and her daughter is not available.  R. at 66.

Plaintiff stated that her injury has adversely affected her ability to socialize and spend time with her family, and also forced her to have to get rid of her horse, as she could no longer care for it. R. at 63, 75-76. She added that, at the time of the ALJ hearing, she was grooming and brushing her daughter's miniature horse on a daily, or at least regular, basis. R. at 63. She also likes to read during the day, and often has the television on for background noise. R. at 63-64.

Plaintiff reported that she spends most days by herself at home, as her daughter goes to work at 8:00 AM and does not return home until 3:30 PM. R. at 64. Plaintiff suffered from depression following her injury and reported that it had grown worse in the months leading up to the ALJ hearing. R. at 78. Plaintiff briefly attended mental health counseling, but had to discontinue the service because "worker's comp didn't recognize that." R. at 64. She added that her primary care doctor prescribed Busforam to treat her depression, but it was not effective. Id. Plaintiff stated that her depression manifests as not wanting to get out of bed, breaking plans with her family, and possible social withdrawal. R. at 65. She stated that, before her injury, "sometimes I may get depressed, but never to this," and that her depression was the worst it has ever been at the time of the ALJ hearing. Id.

Plaintiff's attorney then questioned her about her ability to drive, to ride in a car, and her progress with VESID, and Plaintiff's responses were consistent with her responses to the ALJ's questions. R. at 45-69. Plaintiff's attorney also questioned her about her desire and ability to interact with others, and Plaintiff responded, "I'd rather just not be around too many people." R. at 70. Plaintiff's attorney then questioned her about injuries on her arm. Id. Plaintiff responded that she had injured her arm while she was making tea and baking muffins. Id. She stated that she felt pain in her leg, and then her leg "locked up," causing her to fall on the oven and injuring her arm.

R. at 70-71.  She added that she has not tried to bake muffins since this incident because her "daughter took a fit."  R. at 71.

Plaintiff's attorney also questioned Plaintiff about her caring for her daughter's miniature horse, and her ability to mop her floors following her injuries.  R. at 71-72.  Plaintiff stated that she is able to sit and brush her daughter's horse, and this takes about five minutes, and that she enjoys feeding the horse treats as well.  Id.  Plaintiff stated that her back pain does not prevent her from mopping her floors, but that she cannot mop as fast as she could before her injury, and that her daughter can mop faster than her.  R. at 72.

Plaintiff's attorney then questioned her about her usage of a cane, which she was using on the day of the ALJ hearing.  R. at 73.  Plaintiff stated that her daughter gave her the cane, which is helpful when walking.  Id.  Plaintiff also stated that physical therapy had been beneficial to her, to the extent that she may not have to rely on her medication for about a day after physical therapy.  R. at 73-74.

Plaintiff's attorney then questioned her about the details of her job as a cashier.  R. at 74.  Plaintiff indicated that her duties included tending to the safe, filling out sheets for the lottery, and depositing money and making change at the bank.  Id.  Plaintiff stated that she had not learned any computer skills whatsoever while working as a cashier, nor does she possess any computer skills otherwise.  Lastly, Plaintiff's attorney questioned Plaintiff about her psyche following her injuries.  R. at 75.  Plaintiff responded that she used to work all week and then go visit her kids, or take her grandson to the stables and fairs on weekends, but that she is either unable or lacks the desire to do these things since her injury.  R. at 75-76.

**C.  Procedural History**

ALJ Flanagan issued an unfavorable decision on March 26, 2014. R. at 20. He found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, as her attempt to return to work in May of 2013 lasted only two days and was ultimately unsuccessful. R. at 25. The decision noted that Plaintiff had the following severe impairments: lumbar degenerative disc disease and depression. Id. ALJ Flanagan determined that the Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I (the "Listing"), giving careful consideration to the clinical requirements of Listing § 1.04, which governs spinal disorders. R. at 29; 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ further noted that Plaintiff's mental impairment does not meet or medically equal the criteria of Listing 12.04, because the Plaintiff failed to satisfy the "paragraph B" criteria of Listing 12.04, and the evidence in Plaintiff's case failed to establish the presence of the "paragraph C" criteria of Listing 12.04. R. at 29-30.

ALJ Flanagan also determined that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b). R. at 30. He noted that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, sit six hours in a routine eight-hour workday, and stand/walk six hours total in such a workday. Id. Also, Plaintiff could engage in occasional climbing stairs/ramps, or stooping; and no climbing ladders, ropes or scaffolds; and no balancing, kneeling or crawling. Id. He assessed that Plaintiff's mental limitations barred her from confrontation, negotiation tasks, and high-paced production tasks; however, she could accept instructions from supervisors and relate adequately with co-workers and the public. R. at 31. Lastly, he found Plaintiff's statements concerning the intensity, persistence, and limiting effects of

14

her symptoms inconsistent with the rest of the record, and that the record lacked sufficient

documentary evidence to corroborate a totally disabling impairment in Plaintiff's case.  Id.

Although ALJ Flanagan determined that the claimant is unable to perform any past relevant

work, and has a ninth grade education, he concluded that there were jobs that existed in the national

economy that the Plaintiff could perform.  R. at 32.  Therefore, Plaintiff was not disabled under the

Social Security Act as of February 15, 2012, the date the claim was filed.  R. at 32-33.

## III.    LEGAL STANDARD

### A.  Standard of Review

When a court reviews an ALJ's final decision, it must determine whether the ALJ applied

the correct legal standards and whether the decision is supported by substantial evidence in the

record.  42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.)

(citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)).  Substantial evidence amounts to

"more than a mere scintilla," and it must reasonably support the decision-maker's conclusion.

Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389,

401 (1971)).  The Court defers to the Commissioner's decision if it is supported by substantial

evidence, "even if it might justifiably have reached a different result upon a de novo review."

Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting

Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).  However, the

Court should not uphold the ALJ's decision when there is substantial evidence to support the

decision, but it is not clear that the ALJ applied the correct legal standards.  Johnson v. Bowen, 817

F.2d 983, 986 (2d Cir. 1987).

### B.  Standard for Benefits

15

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)). In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." Id. § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe, medically determinable physical or mental impairment, or a combination of impairments that are severe, that meet the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If he or she does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. pt. 404(P), app. I. Id. § 404.1520(a)(4)(iii). If it does not, the SSA moves on to step four to

review the claimant's RFC and past relevant work.  Id. § 404.1520(a)(4)(iv).  If the RFC reveals that

the claimant can perform past relevant work, the claimant is not disabled under SSA standards.  Id.

If the claimant cannot perform his past relevant work, the SSA decides at step five whether

adjustments can be made to allow the claimant to work somewhere in a different capacity.  Id.

§ 404.1520(a)(4)(v).  If appropriate work does not exist, then the SSA considers the claimant to be

disabled.  Id.

## IV.    DISCUSSION

Plaintiff argues that the Commissioner's final decision was not based on substantial

evidence because: (1) the RFC determination was not supported by substantial evidence because the

ALJ never offered an explanation as to why he rejected the opinions from independent medical

examiners Drs. Paarlberg and Hausmann; (2) the ALJ's credibility determination is unsupported by

substantial evidence; and (3) the ALJ erred in mechanically applying the Medical-Vocational

Guidelines despite the existence of significant non-exertional impairments.  Pl.'s Br. at 12-19.

### A.  RFC Determination

Plaintiff contends that the ALJ's RFC determination was not supported by substantial

evidence, as the ALJ failed to explain why opinions from Drs. Paarlberg and Hausmann were

rejected.  Pl.'s Br. At 12.  As Plaintiff notes, when a treating physician's opinion is not given

controlling weight, "the administrative law judge must explain in the decision the weight given to

the opinions of a State agency medical or psychological consultant or other program physician,

psychologist, or other medical specialist, as the administrative law judge must do for any opinions

from treating sources [or] nontreating sources."  20 C.F.R. § 404.1527(e)(2)(ii).  Plaintiff further

points out "The ALJ must . . . articulate his reasons for assigning the weight that he does to both

treating and nontreating physicians' opinions." Hatcher v. Astrue, 802 F. Supp. 2d 472, 476

(W.D.N.Y. 2011). In this case, the ALJ clearly based his determination on the evaluation by state

agency evaluator Dr. Panek, a nontreating physician; thus he is required to explain his rationale for

the weight given to other treating or non-treating sources. R. at 31; 20 C.F.R. § 404.1527(e)(2)(ii).

In determining the authoritative value of a treating physician's medical opinion, the ALJ

must consider "(i) the frequency of examination and the length, nature, and extent of the treatment

relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the

record as a whole; (iv) whether the opinion is from a specialist; and (v) consistency of the opinion."

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); accord Schaal v. Apfel, 134 F.3d 496, 503 (2d

Cir. 1998). Defendant concedes that the ALJ did not explain his reasoning with respect to Dr.

Paarlberg's opinion, but that he did discuss Dr. Paarlberg's opinion as required, and that his

decision indicates that he rejected this opinion. Def.'s Br. at 4-5. However, the ALJ's discussion of

Dr. Paarlberg's opinion is a mere two sentences. R. at 28. Further, these two sentences serve only

to restate Dr. Paarlberg's opinion, and lack any indication as to the weight the ALJ gave to the

opinion or his rationale for doing so. Id. The ALJ also failed to state what weight he gave to Dr.

Hausmann's opinion, and his reasons for doing so. Id. The ALJ further failed to state what weight

he gave the opinions of treating physicians at Comprehensive Pain Relief. R. at 27. At

Comprehensive Pain Relief, Dr. Sethi and FNP Kurrey treated Plaintiff regularly from January 2012

to July 2013, and the majority of Plaintiff's evaluations are signed by FNP Kurrey. R. at 218, 234,

294, 296, 299-310, 330-46, 346-63. The ALJ mentions Dr. Sethi by name once in his decision, and

never mentions FNP Kurrey. R. at 26. Similar to his treatment of opinions from Drs. Hausmann

and Paarlberg, the ALJ restates findings of treatment reports from Comprehensive Pain Relief, but does not state the weight given to these findings or his rationale for doing so. R. at 27.

Although there is evidence in the record to support the ALJ's decision, the Court should not uphold the ALJ's decision because it is not clear that the ALJ applied the correct legal standard. Johnson, 817 F.2d at 986. While it is clear that the ALJ based his decision on the evaluation of Dr. Panek and rejected the opinions of Drs. Paarlberg and Hausmann, the legal standard required him to explain in his decision the weight that was given to all treating and non-treating sources, and his rationale for doing so. 20 C.F.R. § 404.1527(e)(2)(ii).

In light of the foregoing, the Court finds that it is not clear whether the ALJ applied the correct legal standard. The ALJ failed to state the weight he gave to the medical opinions of Drs. Paarlberg, Hausmann, Sethi, and FNP Kurrey, and, even if the weight he may have given these opinions could be inferred, he failed to state his underlying rationale in accordance with 20 C.F.R. § 404.1527(e)(ii). Accordingly, the matter must be remanded for an evaluation of Plaintiff's RFC consistent with the applicable legal standard.

**B. Credibility**

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility. Pl.'s Br. at 16-17. "An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" Lewis v. Apfel, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting Gallardo v. Apfel, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's analysis must be based on a two-step analysis of pertinent

19

evidence in the record.  See 20 C.F.R. §§ 404.1529, 416.929; see also Foster v. Callahan, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. 1998).

First, the ALJ must determine, based upon Plaintiff's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(a), 416.929(a).  Second, if the medical evidence by itself establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limits the claimant's capacity to work.  Id. §§ 404.1529(c), 416.929(c).

If objective evidence does not by itself substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must then determine the credibility of the claimant's subjective complaints by analyzing following factors: (1) the claimant's daily activities; (2) location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to symptoms.  Id. §§ 404.1529(c)(3), 416.929(c)(3).

ALJ Flanagan found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." R. at 31.  The fact that the ALJ does not identify which of the "some" symptoms he reasonably expects to be caused by Plaintiff's medically determinable impairments is troublesome, because, given a specific symptom, the ALJ has failed to answer the question of whether specific

symptoms could or could not be reasonably expected to be caused by Plaintiff's impairments. Although the ALJ does engage in an adequate discussion of step two, the Court's ability to answer whether or not ALJ based his credibility determination on substantial evidence is hindered by the ambiguity present in his analysis at step one. R. at 31.

Despite this ambiguity, it can be inferred that the ALJ found the objective evidence incompatible with Plaintiff's perceived intensity, persistence, and limiting effects of her symptoms. Id. When the ALJ finds the objective evidence insufficient to substantiate the intensity, persistence, and limiting effects of the claimant's symptoms, he must analyze the seven factors associated with step two of the two-step inquiry to determine the credibility of the claimant's statements. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). In this analysis, the ALJ noted that Plaintiff suffers from extreme lower back pain following two work-related injuries, which flares to high levels three to four times per week, and that she treats her pain with medication. R at 31. Further, Plaintiff can only stand or sit for brief but indeterminable amounts of time. Id. Plaintiff can handle most of her personal needs, though she lives with her daughter, who usually transports Plaintiff and cooks, does the dishes, and most of the housework for her. Id. Although Plaintiff occasionally drives herself and is able to mop her floors, she sometimes doesn't bother to get dressed, has few interests following her injuries, and spends most of her time home alone watching TV or reading. Id. Plaintiff has a ninth grade education, but can read and write, and is currently working with VESID to get her GED. Id. Thus, the ALJ's analysis of step two in determining Plaintiff's credibility is more than adequate, and addresses the factors in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Id.

The ALJ also had the opportunity to appraise Plaintiff's credibility. R. at 40-80. The Court should defer to the ALJ's determination as long as it is supported by substantial evidence. Selian v.

21

Astrue, 708 F.3d 409, 420 (2d Cir. 2012).  The Court further notes that Plaintiff's statements to the ALJ regarding her inability to cook following her injuries are not consistent with the fact that she admitted she was cooking muffins a week before the ALJ hearing.  R. at 31, 70-71.  Given this, and the fact that the ALJ engaged in a substantial analysis of Plaintiff's daily activities, symptoms, and the effectiveness of her treatment and medications, there is substantial evidence to support the ALJ's findings regarding the Plaintiff's credibility.  R. at 31.

In light of the foregoing, the Court finds that the ALJ's credibility determination was supported by substantial evidence.  He engaged in the two-step analysis as prescribed by regulations and had a first-hand opportunity to appraise Plaintiff's credibility.  Accordingly, the ALJ's credibility determination is affirmed.

### C. Step Five

Plaintiff asserts that the ALJ erroneously applied the Medical-Vocational Guidelines (the "Grids") in finding Plaintiff not disabled, because Plaintiff has non-exertional limitations which significantly limit the range of work she can perform.  Pl.'s Br. at 17-19.  Plaintiff relies on Burgos v. Barnhart, No. 01 Civ. 10032, 2003 WL 21983808, at *18 (S.D.N.Y. Aug. 20, 2003) (citing Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)), for this assertion.  Though it is true that Bapp requires a departure from the Grids when a non-exertional limitation will significantly limit the range of work Plaintiff can perform, it is also up to the ALJ to determine whether such limitations are significant.  802 F.2d at 605-06.  In this case, ALJ Flanagan noted "[t]he addition[al] non-exertional limitations do not amount to substantial erosion of the routine occupational base for light work under the Act."  R. at 30.  While Plaintiff points out that the ALJ's decision identifies non-exertional limitations, such as balancing and stooping, it is clear that the ALJ concluded that the

additional limitations had little or no substantial effect given an occupational base of unskilled light work.  R. at 32.

Given the errors in the ALJ's RFC determination, and that the step five analysis is based on the RFC determination, the Court cannot conclude that the step five analysis is supported by substantial evidence.  Accordingly, on remand, the ALJ is instructed to reevaluate Plaintiff's RFC determination by reconsidering the weight given to the opinions of Drs. Paarlberg and Hausmann, and explain his reasoning for basing his decision on the sole opinion of Dr. Panek.  The ALJ should then engage in a step five analysis that incorporates the reevaluated RFC.

Plaintiff also argues that a vocational expert was required in this case.  Pl.'s Br. at 18. Plaintiff correctly asserts that an ALJ must introduce the testimony of a vocational expert, or other similar evidence, in cases where non-exertional impairments render application of the Grids inappropriate.  Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir. 1999); see also Bapp, 802 F.2d at 603. On the other hand, the ALJ is not obliged to elicit testimony from a vocational expert when a claimant's RFC falls within the categories of the Grids.  Gravel v. Barnhart, 360 F. Supp. 2d 442, 448 (N.D.N.Y. 2005).  Given that the ALJ's RFC determination was not supported by substantial evidence, and that the requirement of the ALJ to elicit testimony from a vocation expert is based on whether Plaintiff's RFC falls within the Grids, the Court cannot conclude that the ALJ's decision not to elicit testimony from a vocational expert was properly determined.  Accordingly, on remand, the ALJ's decision should articulate whether or not eliciting testimony from a vocational expert is appropriate following a re-evaluation of Plaintiff's RFC.

V.      CONCLUSION

Accordingly, it is hereby:

23

**ORDERED**, that the decision of the Commissioner is **VACATED and REMANDED** for further proceedings consistent with this Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED:      July 01, 2016
             Albany, New York

Lawrence E. Kahn
U.S. District Judge